FILED

SEP 1 3 2010

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

POSTED ON WEBSITE

FOR PUBLICATION

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
FRESNO DIVISION

| | |
|---|---|
| In re | Case No. 09-13995-B-11 |
| Kenneth R. Hale, | DC No. UST-1 |
| Debtor. | |

**MEMORANDUM DECISION REGARDING UNITED STATES TRUSTEE'S MOTION TO COMPEL PAYMENT OF QUARTERLY FEES**

Gregory S. Powell, Esq., appeared on behalf of August B. Landis, Acting United States Trustee.

Riley C. Walter, Esq., of the Walter & Wilhelm Law Group appeared on behalf of the debtor, Kenneth R. Hale.

Before the court is a contested matter (the "Motion") filed by the United States Trustee (the "UST") to compel the payment of quarterly fees by the chapter 11 debtor, Kenneth R. Hale (the "Debtor"). It was brought in conjunction with the Debtor's motion to confirm a chapter 11 plan.[1] Prior to filing this bankruptcy case, the Debtor was a member of a farming partnership and had personally guaranteed two loans to the partnership from two separate creditors. The loans were secured by the Debtor's real property. Both loans were also in default and the creditors were unwilling to be paid through a plan of reorganization. However, the Debtor was

---

[1] The pleading as filed is entitled "United States Trustee's Motion and Reservation of Rights Regarding Quarterly Fees." The UST did not object to confirmation of the plan. The court has deemed this to be a motion to compel payment of the quarterly fees based on a dispute over how the fees should be calculated.

able to obtain DIP financing from a third party. As part of the reorganization process, the DIP financier agreed to purchase and accept an assignment of the two secured claims. The DIP financier then agreed to restructure the claims for payment through a chapter 11 plan. The UST contends that this transaction was a "disbursement" upon which the UST is entitled to collect a quarterly fee pursuant to 28 U.S.C. § 1930(a)(6). However, the UST has not shown that the Debtor had any interest in, or control over, the money used by the DIP financier to acquire the secured claims. Accordingly, the Motion to compel payment of a fee based on that transaction will be denied. To the extent that the Debtor still owes any remaining fees for the 1st and 2nd quarters of 2010, the Motion is unopposed and will be granted.

This memorandum contains the court's findings of fact and conclusions of law required by Federal Rule of Civil Procedure 52(a), made applicable to this contested matter by Federal Rule of Bankruptcy Procedure 7052. The bankruptcy court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 & 1930, 11 U.S.C. § 105(a)$^2$ and General Orders 182 and 330 of the U.S. District Court for the Eastern District of California. This is a core proceeding as defined in 28 U.S.C. §157(b)(2)(A).

**Background and Findings of Fact.**

Prior to commencement of this bankruptcy, the Debtor operated a farming enterprise known as Double H Farms, a California general partnership ("Double H"). In January 2007, Double H and the Debtor borrowed more than $2.5 million from Fresno-Madera Production Credit Association ("PCA"). That loan was

---

$^2$Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1330, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9036, as enacted and promulgated *after* October 17, 2005, the effective date of The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. 109-8, Apr. 20, 2005, 119 Stat. 23.

2

secured by, *inter alia*, a deed of trust against real property owned by the partners of Double H: the Debtor, his wife Jennifer Hale, and his brother Richard Hale (the "PCA Loan"). Thereafter, the PCA Loan underwent several rounds of default and renegotiation. The outstanding balance was significantly reduced just prior to the bankruptcy through the sale of some real property. However, the PCA Loan remained in default and PCA was unwilling to grant any further extension.

In August 2007, Double H and the Debtor borrowed $1.2 million from Fresno-Madera Federal Land Bank Association, FLCA ("Land Bank"). That loan was secured by, *inter alia*, a junior deed of trust against some of the Debtor's real property (the "Land Bank Loan"). The Land Bank Loan was also reduced significantly through the prepetition sale of property, but the Loan remained in default.[3]

In March 2009, Richard and Jennifer Hale withdrew as partners from Double H. In April 2009, PCA commenced litigation in the state court against Double H and its former partners and a receiver was appointed to take possession of the Debtor's real property. This bankruptcy case commenced first under chapter 12 on May 1, 2009. For eligibility reasons, the case was converted to chapter 11 on May 6, 2009. Thereafter, the Debtor continued to oversee the farming operation in his capacity as debtor-in-possession.[4]

In June 2009, this court approved a DIP financing agreement between the Debtor and Britz Ag Finance, Co. ("BAFCo"). The Debtor borrowed $1.55 million to fund the remainder of the 2009 farming operation. The new financing was secured by the 2009 crops (the "2009 DIP Loan"). In conjunction with the 2009 DIP Loan, the Debtor entered into a stipulation with BAFCo, PCA and Land Bank.

---

[3]In September 2009, PCA and Land Bank filed proofs of secured claims in this bankruptcy case in the amounts of $1,038,664.65 and $1,275,886.45, respectively.

[4]Neither Double H nor the former partners have sought bankruptcy relief.

Pursuant to that stipulation, both PCA and Land Bank agreed to not interfere with production of the 2009 crops. In return, they were both granted relief from the automatic stay to foreclose against the Debtor's property after December 31, 2009.

After the harvest, the 2009 DIP Loan was repaid in full and the Debtor began to formulate his chapter 11 plan of reorganization. By December 2009, BAFCo agreed to provide the Debtor with a new line of credit to help finance the 2010 crop. BAFCo also agreed to step in and take out both PCA and Land Bank, neither of which were willing to forego foreclosure and be paid through the chapter 11 plan. Both creditors had noticed foreclosure sales to take place in early February 2010.

On February 3, 2010, this court approved a multifaceted agreement involving the Debtor, BAFCo, PCA and Land Bank. The structure of that transaction is detailed in a document entitled "Loan Restructure and Forebearance [sic] Agreement" dated January 28, 2010 (the "BAFCo Restructure") and in the Declaration of Kenneth R. Hale filed in response to this Motion.[5] In summary, on or about January 20, 2010, BAFCo purchased and took a full assignment of both the PCA Loan and the Land Bank Loan (hereafter, the "Assigned Loans"). The purchase price paid to PCA and Land Bank was an amount which included the unpaid principal balances plus accrued interest and reimbursement of their attorneys fees. The funds were paid by BAFCo directly to PCA and Land Bank. The Assigned Loans remained secured by the original security agreements which were also assigned to BAFCo. BAFCo then agreed to postpone the scheduled foreclosure sales while the Debtor sought court approval of the BAFCo Restructure transaction.

---

[5] The Loan Restructure and Forbearance Agreement is attached to this court's Order on Motion to Borrow and Give Security dated February 3, 2010 (the "Borrowing Order"). At the final hearing on this Motion, the court stated its intention to accept the recitals in the Borrowing Order as evidence of the terms of the BAFCo Restructure. The UST declined an invitation to conduct discovery and produce additional evidence, escrow documents, etc., which might further illustrate how the BAFCo Restructure was actually structured and documented.

1  Upon approval, the due dates for the Assigned Loans were extended to January 20,
2  2011. The Debtor confirmed his chapter 11 plan on June 25, 2010.

**Issues Presented.**

The Debtor's February 2010 monthly operating report (the "MOR") reported the receipt of funds described as "Restructure FLB Land [sic] Loan - BAFCO" and an offsetting disbursement entitled "Payments to Federal Land Bank," both in the amount of $1,449,810.27. These entries were explained in the MOR at exhibit C as "Amounts paid to Federal Land Bank and Production Credit Association by New Loan from BAFCO." In April 2010, the Debtor amended the February MOR to remove the above-referenced line items with the following explanation, "report is being amended to delete 'income' and 'expense' figures of $1,449,810.27 which was a restructure of debt and not income or expense but were originally added only for information purposes." Based on the transactions reflected in the original MOR, the Debtor would owe a 1st quarter 2010 fee to the UST in the approximate amount of $6,500. Based on the amended MOR, the Debtor's 1st quarter fee is reduced to $4,875. The amount at issue here is $1,625.

The UST contends in the Motion that the Debtor has not yet paid all of the fees due for the 1st and 2nd quarters of 2010. However, the sole issue presented here is whether the base for calculation of those quarterly fees should include the amounts BAFCo paid to acquire the PCA Loan and the Land Bank Loan as reflected in the BAFCo Restructure.

**Analysis and Conclusions of Law.**

Under federal law, the United States Trustee is authorized to collect a "quarterly fee" from a debtor who files for relief under chapter 11 of the Bankruptcy Code. The applicable statute is 28 U.S.C. subsection 1930(a)(6), which provides in pertinent part, "[i]n addition to the filing fee paid to the clerk, a quarterly fee shall be paid to the United States trustee . . . in each case under chapter 11 . . . for each quarter . . . until the case is converted or dismissed, whichever occurs first." The

statute then prescribes a graduated schedule for calculating the fee based on the total amount of "disbursements" made in the bankruptcy case during each quarter. Subsection 1930(a)(6) was enacted as part of the Bankruptcy Judges, United States Trustees, and Family Farmer Act of 1986, Public Law 99-554. Congress increased the fees payable to the United States Trustee, and established a quarterly fee to be paid by chapter 11 debtors in an effort to make the U.S. Trustee program self-funding. *See In re Meyer*, 187 B.R. 650, 651 (Bankr. W.D. Mo. 1995), H.R.Rep. No. 764, 99th Cong.2d Sess. 26 (1986) U.S.Code Cong. & Admin.News, 1986, p. 5227.

The Bankruptcy Code does not define the term "disbursement" as it is used in subsection 1930(a)(6) and there appears to be nothing in the legislative history to explain Congress' intent. *See In re Huff*, 270 B.R. 649, 651 (Bankr. W.D. Va. 2001). The UST argues for an expansive definition of the term "disbursement," relying exclusively on the Ninth Circuit's holding in *St. Angelo v. Victoria Farms, Inc. (In re Victoria Farms)*, 38 F.3d 1525 (9th Cir. 1994), *modified*, 46 F.3d 969 (9th Cir. 1995) (not affecting the "disbursement" analysis). In *Victoria Farms*, the court held that the payoff of a secured claim, with proceeds from sale of the creditor's collateral, the debtor's farm, constituted a "disbursement" subject to payment of the UST's fee. The predicate issue in *Victoria Farms* was whether the collateral, and the proceeds, were property of the bankruptcy estate. The farm was subject to a deed of trust. After sale, the proceeds passed to the secured creditor and others through an escrow agent. The bankruptcy court ruled that the sale was not subject to the payment of UST fees because the proceeds were not paid out by the debtor. The district court affirmed without explanation holding that all payments made to a secured creditor from the sale proceeds of its collateral should be excluded from the assessment of the UST fees. 38 F.3d at 1533.

The court of appeals reversed based on its determination that the sale proceeds constituted property of the bankruptcy estate. The court interpreted the

6

statute to mean "that the [US] trustee is entitled to fees based on the total amount of 'disbursements' *from the [bankruptcy] estate*." 38 F.3d at 1534 (emphasis added). The decision hinged on the question of whether the farm's status as collateral for a secured claim somehow removed it from the bankruptcy estate. "We have expressly held that *all* property that is subject to a secured claim becomes part of the bankruptcy estate. . . . Accordingly, we conclude that the farm was part of Victoria Farms' bankruptcy estate and its sale proceeds should not have been excluded in calculating [the UST] fees." 38 F.3d at 1535 (emphasis in original, citation omitted).

        The Ninth Circuit's interpretation of the term "disbursement" in *Victoria Farms* was a logical extension of its conclusion that payment of the secured claim involved a transfer of property of the bankruptcy estate. For that reason, this court is not persuaded that the *Victoria Farm's* decision is applicable to the present case. The BAFCo Restructure did not involve the sale of estate property. BAFCo's acquisition of the PCA and Land Bank Loans involved a transfer of BAFCo's money, not the Debtor's. The UST has not offered any evidence, nor identified any aspect of the BAFCo Restructure, to suggest that the transaction involved a "disbursement from the estate." 38 F.3d at 1534.

        Following the holding in *Victoria Farms*, one bankruptcy court reached a similar result in *In re Meyer*, 187 B.R. at 650. The *Meyer* decision is particularly illustrative here because of the way the court used a "property of the bankruptcy estate" analysis to resolve the issue. While the debtor was in chapter 11, he sold some real property which he owned jointly with his estranged nonfiling spouse. The proceeds were used to pay the debt secured by the property. The U.S. Trustee sought to collect a fee based on the entire amount paid to the creditor. The debtor objected because he only owned one half of the property. The court first analyzed whether the real property, held under Missouri law as "tenants by the entirety," and its proceeds were property of the bankruptcy estate. Based on this analysis, the

7

court then assessed a fee for the U.S. Trustee based on the debtor's half interest in the real property. The fee was based on half of the amount paid to the secured creditor even though the debtor was jointly liable for the entire amount.

> However, before I can reach the issue of whether the UST is entitled to quarterly fees on disbursements of said proceeds, I must determine if the Real Estate held as tenants by the entirety *is an asset of the bankruptcy estate* when only one spouse files for bankruptcy.
>
> . . .
>
> Since only one-half of the proceeds *became property of the estate*, it stands to reason that only one-half of the disbursements to secured creditors in satisfaction of their liens came from the bankruptcy estate. Therefore, I find that $144,223.42 of the $288,446.84 distributed to secured creditors was a distribution subject to quarterly fees.

*Id.* at 652-53 (emphasis added).

In a subsequent decision, the Ninth Circuit revisited its holding in *Victoria Farms* to clarify that a "property of the bankruptcy estate" test was too restrictive. *U.S. Trustee v. Celebrity Home Entertainment, Inc. (In re Celebrity Home Entertainment, Inc.)*, 210 F.3d 995 (9th Cir. 2000). The debtor argued that it should not have to pay postconfirmation fees to the U.S. Trustee because the property revested and the bankruptcy estate ceased to exist upon confirmation of its chapter 11 plan.[6] Observing that *Victoria Farms* called for an expansive definition of the term "disbursements," the court stated:

> Finally, our decision in [*Victoria Farms*] is not binding precedent for the proposition that the term "disbursements" includes only "payments from the bankruptcy estate.". . . The [*Victoria Farms*] opinion does not say that disbursements are *limited to* payments from a bankruptcy estate.

*Id.* at 998 (emphasis in original).

---

[6]Prior to amendment in 1996, subsection 1930(a)(6) only required the payment of a quarterly fee until the date a plan of reorganization was confirmed. The statute was then amended to delete the term "until a plan is confirmed" from the limiting language of subsection 1930(a)(6). *In re Celebrity Home Entertainment, Inc.* was filed before the amendment and the debtor also argued that the amendment was not applicable to its case.

8

Numerous other courts have struggled to define the term "disbursement" and a significant body of case law has developed on the subject. Indeed, a majority of those decisions have supported the U.S. Trustee for various reasons. However, the common thread that appears to bind many of those decisions together is the fact that the debtor had some interest in, or control over, the money disbursed. For example, the case of *Michel v. HSSI, Incorporated (In re HSSI, Inc.)*, 193 B.R. 851 (N.D. Ill 1996) involved transfers of money (proceeds from the sale of consigned inventory) from the debtor's twenty-seven co-debtor subsidiaries to the debtor's DIP lender. The money was transferred through a series of blocked accounts pursuant to the terms of an approved DIP financing order. Since the subsidiaries sold the inventory, and the debtor owned or controlled the blocked accounts, the U.S. Trustee argued that *both* the debtor and its subsidiaries should pay a quarterly fee based on those transfers. The trial court found that the "blocked account" arrangement involved inter-company transfers and did not reflect any "real economic activity" on the part of the subsidiaries. 193 B.R. at 853-54. It denied the request for a double assessment of fees. The district court reversed and remanded for a determination of whether the subsidiaries had any interest in the money stating, "[o]ther than the fact that there was a consignment arrangement between HSSI and the Subsidiaries and the language of the [DIP] Financing Order, *there are no facts found and no law stated which support the conclusion that the subsidiaries had no interest in the collateral proceeds.*" *Id.* at 855 (emphasis added). The district court clearly understood that the "interest or control" question would determine the application of subsection 1930(a)(6).

In *United States Trustee v. Wernerstruck, Inc. (In re Wernerstruck, Inc.)*, 130 B.R. 86 (D.S.D. 1991), the district court held on appeal that the debtor's prepayment of a credit line constituted a "disbursement" even though the prepayment simply enabled the debtor to borrow more money in the future. The bankruptcy court looked to the Internal Revenue Code for guidance and ruled that only a complete

9

irrevocable transfer, which gives the creditor the full benefit and use of the money, could constitute a "disbursement." 130 B.R. at 88. The bankruptcy court viewed the prepayment as a deposit which could be withdrawn by the debtor at any time. *Id.* at 89. However, the district court characterized the prepayment as a reduction of debt and held, "*[w]hen the debtor makes payments to the Bank*, they are disbursements within the meaning of § 1930(a)(6) whether they are the required annual payment or a prepayment on the loan." *Id.* at 89 (emphasis added). Unlike the present case, there was no question in *Wernerstruck* that the debtor had an interest in, and control over, the money it used to pay the bank.

Before *Victoria Farms* was decided, the district court in *Office of the United States Trustee v. Hays Builders, Inc. (In re Hays Builders, Inc.)*, 144 B.R. 778 (D.W.D. Tenn. 1992) held that moneys paid to a secured creditor by a third party in connection with the sale of assets of the bankruptcy estate constituted a disbursement even though the debtor did not physically handle the money. The court was wary of creating "an opportunity to avoid paying the [U.S. Trustee] fees by setting up third party disbursing arrangements." 144 B.R. at 780. The important point for purposes of this analysis is the fact that the disputed "disbursement" in *Hays Builders* involved property of the bankruptcy estate. The debtor unquestionably had an interest in, and control over, the disposition of its own property.

In the case *In re Sgaverdea*, 377 B.R. 308 (Bankr. D.N.M. 2007), the bankruptcy court applied the term "disbursement" broadly to include both payments made under the chapter 11 plan and payments made to trade creditors in the ordinary course of the debtor's postconfirmation business. "'Disbursement' means 'money paid out; expenditure;' and 'payment.'" *Id.* at 312 (citation omitted) (quoting American Heritage Dictionary, 2d Ed. at 402 (1982)). Again, there was no question in *In re Sgaverdea* that the debtor was using its own money and had complete control over the payment of ordinary-course business expenses.

10

Here, the BAFCo Restructure involved the inter-creditor transfer of debt, including the associated loan documents and security agreements. After negotiating with PCA and Land Bank to purchase the Assigned Loans, BAFCo agreed separately with the Debtor to postpone the scheduled foreclosures and restructure the debt so the Debtor could confirm a chapter 11 plan. Based on the record, the court cannot find that the Debtor had any interest in, or control over, BAFCo's decision to purchase the Assigned Loans, or the money it used to do so. Although the BAFCo Restructure may have been an internal part of a larger agreement negotiated with the Debtor, BAFCo had the ultimate control over the final decision to pay its money and acquire the Assigned Loans.

The Debtor argues that the BAFCo Restructure simply substituted one creditor for two others and that the net effect on the Debtor's balance sheet was zero. The Debtor contends that a "disbursement" within the meaning of subsection 1930(a)(6) requires a corresponding reduction of assets and liabilities. Unlike the transaction in *Victoria Farms*, the BAFCo Restructure did not involve a reduction (sale) of assets and it had little effect on the Debtor's liabilities. Although the Debtor's "balance sheet" analysis may fit in this case, the court rejects it as the proper test for interpreting the term "disbursement" in subsection 1930(a)(6). The pure "balance sheet" approach suggested by the Debtor could exclude common events, such as a debt refinance transaction, from the assessment of U.S. Trustee fees even though the debtor may actually have some interest in, or control over, the new loan proceeds. In a typical refinance transaction, the new money is loaned *to the debtor* before it is paid out to satisfy the old obligation.

In the case *In re Huff*, 270 B.R. at 649, the bankruptcy court assessed a quarterly fee on a transaction involving a loan refinance. The debtor obtained a new loan to pay off a preexisting obligation and argued that the transfer simply substituted one debt for another. Citing the holdings in *Victoria Farms* and *Meyer*, the court apparently assumed, without specifically finding, that the debtor had both

some interest in, and control over, the proceeds of the new loan such that the refinance should qualify as a "disbursement" for the purpose of assessing the U.S. Trustee's quarterly fee. The court did not analyze the flow of the funds from the new lender to the old lender. Instead, the court looked at the "revenue generating" purposed behind the enactment of subsection 1930(a)(6). *In re Huff*, 270 B.R. at 653. The fact that the debtor had both an interest in, and control over, the transfer of money was reflected in the court's ruling,

> This court finds that the statute mandates a fee *when a debtor pays out or expends money*, until the Chapter 11 case is converted or dismissed, even if the result seems harsh.
>
> The court finds that the definition of disbursement is broad enough to include the refinance transaction here. *The prior loan was retired by a payment made by the Debtor or on behalf of the debtor* and it was made to a creditor.

*Id.* (emphasis added).

Following this rational, the UST argues in his reply brief that BAFCo merely refinanced the PCA and Land Bank Loans and that the Loans were actually paid with new money the Debtor borrowed from BAFCo. Certainly, the Debtor's original MOR would tend to support that argument, however, the MOR was amended to report the BAFCo Restructure as reflected in the operative documents. Other than the MORs, the only evidence before the court, a declaration from Kenneth R. Hale and the Loan Restructure and Forbearance Agreement, suggests that BAFCo used its own money to acquire the debt and security agreements from PCA and Land Bank. This court never had jurisdiction over BAFCo's money. Unlike a transaction involving the acquisition of postpetition credit, or a sale of estate property, the bankruptcy court does not need to approve the transfer of debt from one creditor to another. BAFCo was free to acquire any creditor's debt instruments at any time. The fact that BAFCo and the Debtor subsequently, or perhaps simultaneously, agreed to restructure the Assigned Loans as part of the

chapter 11 reorganization process does not change the result.[7]

Finally, the court rejects the UST's contention that a quarterly fee should be assessed because the BAFCo Restructure was made on behalf of and for the benefit of the Debtor. *See In re Pars Leasing, Inc.*, 217 B.R. 218-19 (Bankr. W.D. Tex. 1997) (the term "disbursement" was defined to include payments made by third parties on behalf of the debtor). Reasonable minds could disagree over whom BAFCo was acting "on behalf of" when it purchased the Assigned Loans and it would not be appropriate to examine here BAFCo's motives for doing so. However, even if BAFCo was acting to some degree "on behalf of" the Debtor, the "disbursement" issue can still be evaluated through the "interest or control" inquiry discussed above.

With regard to the "benefit of the Debtor" issue, a pure "benefit" test has the potential of going far beyond the "expansive" definition of "disbursement" called for in *Victoria Farms*. Debtors seek relief under chapter 11 to reorganize their financial affairs. Inherent in the term "reorganize" is the notion that a successful chapter 11 proceeding will involve numerous negotiations with third parties resulting in agreements and transactions designed to benefit the debtor and improve the debtor's financial position. There is no basis to equate the term "disbursement" in subsection 1930(a)(6) with every form of third-party transaction that simply benefits the debtor in the reorganization process.

**Conclusion.**

Based on the foregoing, the UST has not shown that the Debtor had any interest in, or control over, the funds used by BAFCo to acquire the PCA and the Land Bank Loans. The court therefore finds and concludes that the acquisition of those Loans as reflected in the BAFCo Restructure did not constitute a

---

[7]The U.S. Trustee will still be able to collect a quarterly fee pursuant to subsection 1930(a)(6) when the Debtor makes payments to BAFCo under the confirmed plan.

13

"disbursement" within the meaning of 28 U.S.C. § 1930(a)(6). Accordingly, the Motion to compel payment of a quarterly fee to the UST based on the BAFCo Restructure transaction will be denied. To the extent that the Debtor has not yet paid any fees for the 1st and 2nd quarters of 2010, calculated without the BAFCo Restructure, the Motion will be granted.

Dated: September  /3 , 2010

W. Richard Lee
United States Bankruptcy Judge